UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

SHARON THURBER,

                     Plaintiff,

     v.

AETNA INSURANCE COMPANY,

QUEST DIAGNOSTICS, INCORPORATED
WELFARE PLAN (also known as the Quest
Diagnostics' Aetna Long-Term Disability Benefit
Plan, and also known as The Quest Diagnostics'
Managed Disability Benefits Plan), and

THE QUEST EMPLOYEE BENEFITS ADMINISTRATION
COMMITTEE, as Plan Administrator,

                     Defendants.

**DECISION AND ORDER**
09-CV-279S

## I. INTRODUCTION

Plaintiff, Sharon Thurber, brings this action seeking declaratory relief concerning her eligibility for long-term disability ("LTD") benefits under the Quest Diagnostics Long-Term Disability Plan (the "Plan"), which is sponsored by her former employer Quest Diagnostics, Inc. ("Quest") and which is governed by 29 U.S.C. §§ 1001, et seq., the Employee Retirement Income Security Act of 1974 ("ERISA"). The Plan is fully insured by Defendant Aetna Life Insurance Company ("Aetna"). There are presently four motions before this Court: (1) Defendants' Motion for Summary Judgment (Docket No. 28); (2) Thurber's Motion to Strike the Affidavits of Deborah Laughran and Carole Roy (Docket No. 37); (3) Defendants' Motion to Strike the Affidavit and attached exhibits of Thurber's counsel, Christen Archer Pierrot (Docket No. 50); and (4) Thurber's Motion for Leave to Supplement the Record (Docket No. 53). For the following reasons, both motions to strike are denied,

1

Thurber's motion for leave to supplement is granted, and Defendants' motion for summary judgment is granted with respect to Thurber's claims and denied with respect to its counterclaims.

## II. BACKGROUND[1]

### A.    Facts

Thurber worked at Quest from 1993 to August 15, 2007 as a client services representative. (AR 883.) In this position, Thurber's duties included reporting client concerns, printing, mailing, answering phones, reporting laboratory results, and general clerical work. (AR 883, 863.) In 1983, Thurber was involved in a severe car accident in which she broke both her legs. (AR 965.) As a result of the breaks, her right leg became almost two inches shorter than her left leg. (AR 965.) On August 17, 2007, Thurber was involved in another car accident that damaged and exacerbated the previous damage to her knees. She applied for disability benefits on the same day, reporting that she suffered "traumatic arthritis in both knees." (AR 721.) After submitting the proper documentation, her application for short-term disability benefits was granted and she received those benefits for six months, from August 2007 until February 20, 2008. (AR 738, 741, 744.)

After that date, to retain her benefits, Thurber was required to apply for LTD benefits and submit a LTD claim questionnaire. Therein, she stated that she suffered from "intermittent and unpredictable" knee pain. Her claim was assigned to claims specialist Malinda High who reviewed her file, which included office notes from Thurber's orthopedist, Dr. Michael T. Grant, and her chiropractor, Anthony J. Bianchi, D.C. (AR 739, 744.) In his September 14, 2007 Attending Physician Statement, Dr. Grant diagnosed Thurber with

---

[1]"AR" citations refer to pages of the Administrative Record, which is attached as Exhibits "A" and "B" to the Affidavit of Carole M. Roy.

degenerative arthritis and noted that her knee "gives out" and is prone to swelling and that she has difficulty walking. (AR 854-856.) Dr. Grant also completed a Capabilities and Limitations Worksheet ("CLW") in which he checked boxes indicating that Thurber could not stand, stoop, kneel, crawl, push, reach above her shoulders, reach forward, bend, carry or twist, but that she could occasionally sit and walk. (AR 866.)

On November 16, 2007, Nurse Sharon Whitaker from Aetna spoke with Thurber's supervisor at Quest, Paul Pilarski, regarding Thurber's job requirements. (AR 730.) He informed Whitaker that her job consisted of sitting for 80% of the day, while the other 20% required her to be "up and down," walking to a room approximately fifty feet away. (AR 730.) Although the job required no lifting, he noted that it did require her to alternate standing and sitting for approximately 12 hours per week. (AR 730.) However, when told that Thurber's CLW permitted no standing, he stated that indeed the job did not require her to stand. Finally, he informed Nurse Whitaker that Quest would work to accommodate Thurber's needs. (AR 732.)

Dr. Grant also provided Malinda High the results of an evaluation performed on February 2, 2008, where he found the following: (1) she complained of recurrent discomfort around the right knee; (2) she suffered from severe post-traumatic arthritis of her knees with bone-on-bone articulation of the medial joint space and varum[2] deformity; (3) she suffered from a small effusion[3] on both her knees; (5) her right knee range of motion was from 2 to approximately 120 degrees, with no instability; (6) her left knee range of motion was from 0 to approximately 125 degrees with no instability; (7) she walks with a cane; and

---

[2]Varum: angled inward; bowleg.  *http://www.merriam-webster.com/dictionary/varus*

[3]Effusion: Increased fluid.  *http://www.mayoclinic.com/health/water-on-the-knee/DS00662*

(8) she remains totally disabled. (AR 911-912).

Dr. Bianchi also completed a CLW, in which he marked boxes indicating that Thurber could occasionally (defined in the CLW as 1%-33% of an eight-hour work day) kneel, lift, and carry and that she could frequently (defined as 34%-66% of an eight-hour work day) stand, sit or walk. (AR 916.) He suggested that Thurber's symptoms required further care, but that she could "slowly work up to an 8[-]hour work day." (AR 916.)

Based primarily on this report, Aetna denied Thurber's LTD claim. (AR 746.)

By letter dated April 5, 2008, Thurber appealed Aetna's decision and notified Aetna that she was scheduled for surgery on April 28, 2008. (AR 933.) To bolster her appeal, Dr. Bianchi submitted office visit notes and a letter advising Aetna that Thurber is unable to work and that she should remain out of work until her surgery. (AR 930-931, 939-941.) Thurber also submitted SOAP[4] notes from her message therapist indicting that Thurber experienced pain and swelling. (AR 943.)

In early May, 2008, Aetna forwarded Thurber's claim to Lawrence Blumberg, M.D., a Board Certified orthopedic surgeon, for review. (AR 949-952.) Dr. Blumberg tried to contact Dr. Grant, but was advised that he does not conduct "peer-to-peers." (AR 951.) After reviewing her file, including, *inter alia*, the aforementioned office notes from Drs. Grant and Bianchi, Dr. Grant's Attending Physician Statement, and Dr. Bianchi's letter, he found that there was not enough evidence to conclude that she was unable to perform the core duties of her occupation and that any opinion that she was not able to work was "not reasonable or appropriate based on clinical documentation provided." (AR 949-952.)[5]

---

[4]SOAP is an acronym standing for "Subjective," "Objective," "Assessment," and "Plan."

[5] In his review, Dr. Blumberg mistakenly attributes Dr. Bianchi's CLW to Dr. Grant. (AR 950.)

Based in part on these findings, Carole Roy, Thurber's appeal specialist, concluded that Thurber was not disabled under the terms of the Plan and denied her appeal. (AR 754.)

Although this exhausted her appeal rights under the Plan, Thurber requested a reconsideration of Aetna's decision. (AR 963-965.) In support of her request, Thurber submitted more medical information, including: (1) a letter from Dr. Grant dated May 6, 2008 demonstrating that Thurber underwent arthrosporic knee surgery seven days earlier, that her range of motion after the surgery was "limited and tender", that the surgery went well, and that her surgical wounds were healing nicely (AR 955); (2) a letter dated June 10, 2008, in which Dr. Grant noted that Thurber uses a cane to walk, that she can flex her leg to 125 degrees, and that she remains disabled from work (AR 960); (3) office notes from Dr. Melvin Mangulabnan, M.D., Thurber's primary care physician (AR 971-975); (4) office notes from Dr. Carlos Martinez, M.D., a rheumatologist, dated November 27, 2007 and April 22, 2008, in which he notes that Thurber was experiencing pain in her knee, but later that she was active and well, noting that he found no swelling in either knee (AR 982-984).

On August 1, 2008, Aetna informed Thurber that her additional information had been received and that it was referring her file to Dr. James Wallquist, M.D., a Board Certified Surgeon, to conduct a second independent review. (AR 540-541.) He concluded that Thurber was functionally impaired for several weeks after her surgery (April 28, 2008 through June 10, 2008), but that she was not impaired either before her surgery (February 21, 2008 through April 27, 2008) or after she healed from the surgery (June 11, 2008 to the date of his review). (AR 1127-1128.)

Yet, this did not complete Thurber's appeal. Now with the assistance of counsel, Thurber submitted more medical documentation. On October 20, 2008, Thurber forwarded

the results of a "Spinal Screening Examination" and a thermal scan conducted by Dr. Bianchi. (AR 1000-1007.) These tests demonstrated that Thurber had asymmetries in the vertebrae of her spine. (AR 1004-1007.) She also submitted a Magnetic Resonance Imaging ("MRI") report that showed disc dessication at several vertebrae. (AR 1019.)

On October 30, 2008 Thurber underwent a Functional Capacity Evaluation ("FCE"), which was conducted by Occupational Therapist Mary Orrange. After several tests, Orrange concluded that Thurber "does not qualify for sedentary physical demand level work." (AR 1030.)

Thurber also supplied Aetna with additional office notes from Dr. Grant, which continued to state that Thurber was totally disabled. (AR 1037.)

On December 4, 2008, upon Aenta's request, Dr. Leila Rangaswamy conducted a third independent review. She pointed out that after the April 2008 surgery, Dr. Grant documented that Thurber had regained full range of motion of the knee. (AR 1123.) She also noted that "there are no functional examination findings suggesting that the claimants ability to work has been impacted by an adverse medical effect during the time period in question." (AR 1123.) In sum, she found that the documentation failed to support a finding of functional impairment.

Relying on these opinions, Carole Roy upheld Aetna's previous decision to deny her claim. (AR 767.)

## III. DISCUSSION

A.    **Summary Judgment Standard**[6]

Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A fact is "material" only if it "might affect the outcome of the suit under governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  A "genuine" dispute exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Id.  In determining whether a genuine dispute regarding a material fact exists, the evidence and the inferences drawn from the evidence "must be viewed in the light most favorable to the party opposing the motion."  Adickes v. S. H. Kress & Co., 398 U.S. 144, 158–59, 90 S. Ct.1598, 1609, 26 L. Ed. 2d 142 (1970) (internal quotations and citation omitted).

"Only when reasonable minds could not differ as to the import of evidence is summary judgment proper."  Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991) (citation omitted).  Indeed, "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper."  Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir. 2004) (citations omitted).  The function of the court is not "to weigh the evidence and determine the truth of the matter but to

---

[6]"Although there is no right to a jury trial in a suit brought to recover ERISA benefits," see, e.g., Tischmann v. ITT/Sheraton Corp., 145 F.3d 561, 568 (2d Cir.1998), and thus this Court would be the fact-finder at trial, "the district court's task on a summary judgment motion – even in a nonjury case – is to determine whether genuine issues of material fact exist for trial, not to make findings of fact." O'Hara v. National Union Fire Ins. Co. of Pittsburgh, PA, 642 F.3d 110, 116 (2d Cir. 2011).

determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

"Summary judgment provides an appropriate mechanism for a court to consider a challenge to the termination of disability benefits under ERISA." See Alfano v. CIGNA Life Ins. Co. of New York, No. 07 Civ. 9661, 2009 WL 222351, at *12 (S.D.N.Y. Jan. 30, 2009) (collecting cases). "In such an action 'the contours guiding the court's disposition of the summary judgment motion are necessarily shaped through the application of the substantive law of ERISA.'" Id. (quoting Ludwig v. NYNEX Serv. Co., 838 F. Supp. 769, 780 (S.D.N.Y.1993)).

## B.     Affidavits of Laughran and Roy

Thurber objects to the Laughran and Roy affidavits and seeks to strike them from the record because neither individual was specifically identified in Defendants' initial disclosures pursuant to Federal Rule of Procedure ("Fed. R. Civ. P.") 26. Instead, Defendants' responded:

> Pursuant to applicable ERISA law, the Court's review is limited to the Administrative Record, produced herewith, and Defendants rely on the Administrative Record to support its [sic] claims and defenses that its [sic] decision was not arbitrary and capricious. At this time, other than the parties herein, their agents, servants, and/or employees and those persons identified in the claim file, Defendants know of not [sic] other witnesses regarding the within occurrence. Defendants reserve the right to supplement this response.

(Notice of Motion to Strike ¶ 3; Docket No. 38.)

Thurber argues that she was prejudiced when both Laughran and Roy submitted affidavits because the information contained therein – Defendants' actions to avoid conflict of interest issues – was not apart of the administrative record, and if she were aware of that information, she would have engaged in further discovery. She seeks to strike these

affidavits under Fed. R. Civ. P. 37(c)(1) or, in the alternative, to engage in further discovery pursuant to Fed R. Civ. P. 56(d) (formerly Fed. R. Civ. P. 56(f) (2009)).

There is no dispute that both Laughran and Roy were, at all times relevant, employees of a party to the litigation, namely Aetna. Defendants response was clear, stating that they were unaware of any parties "*other than the parties herein*, their agents, servants, and or *employees*, and those persons identified in the claim file." (Emphasis added). Thurber concedes that discovery is permissible even in ERISA litigation. Yet, at no time during the discovery period, which ended on February 16, 2010 (Docket No. 15), did Thurber seek discovery or move this Court to compel more specific disclosures. Only now, after a summary judgment motion has been filed, does Thurber seek relief. This, she cannot do. See Schnur v. CTC Commc'ns Corp. Grp. Disability Plan, No. 05 Civ. 3297, 2010 WL 1253481, at *10, n. 12 (S.D.N.Y. Mar. 29, 2010) ("If Plaintiff believed that Defendants did not live up to their discovery obligations, she should have sought Court intervention during discovery, not at this late stage of the proceedings."). Having missed the deadline to conduct discovery, and providing no justifiable reason for doing so, this Court will not impose such a strict form of relief as completely striking Defendants' affidavits from the record.

For substantially the same reasons, Thurber fails to demonstrate that she is entitled to relief under Fed. R. Civ. P. 56(d). Under Rule 56(d), if the party opposing summary judgment "shows by affidavit or declaration that, for specific reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declaration or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d). To obtain such relief, the non-moving party must show: "(1) what facts are sought [to resist the motion] and how they are to be

9

obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." <u>Miller v. Wolpoff & Abramson, LLP.</u>, 321 F.3d 292, 303 (2d Cir. 2003) (alteration in original). The grant of relief pursuant to Rule 56(d) is within the discretion of the district court. <u>See</u> <u>United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.</u>, 995 F.2d 375 (2d Cir. 1993).

As an initial matter, the facts sought are not "essential to justify [Thurber's] opposition." Rather, it appears that Thurber merely seeks to question the veracity of the statements submitted by Roy and Laughran. Moreover, the information contained in the affidavits simply relate to one element, among many, that a court should consider in ERISA suits. But more importantly, because Thurber does not demonstrate why she declined to conduct any discovery, much less why those efforts were unsuccessful, she has failed the third and fourth prongs of the analysis.

Finally, notwithstanding the discovery dispute, the Laughran and Roy affidavits are properly before this Court on a summary judgment motion. Recognizing the long-standing doctrine limiting review of ERISA claims to the administrative record, this Court finds the doctrine inapplicable here. <u>See</u> <u>Daniel v. UnumProvident Corp.</u>, 261 Fed. Appx. 316, 318 (2d Cir. 2008) ("[T]his concern is not implicated in cases where the extraneous evidence being offered goes to a question that was not, or could not have been, under consideration by the plan administrator."). As in <u>Daniel</u>, the information contained in the affidavits is unrelated to the merits of Thurber's disability claim; rather the affidavits are submitted in an effort to demonstrate that Defendants instituted protections against potential bias. As such, the reason behind the doctrine – to prevent federal courts from becoming "substitute plan administrators" – vanishes. <u>See</u> <u>id.</u> Thurber's motion to strike the affidavits is

10

consequently denied.

**C.     Thurber's Motion to Supplement and Defendants' Motion to Strike**

Both of these motions concern paragraphs 3 to 6 and exhibits "A" and "B"of the Pierrot Affirmation, which themselves concern Plan documents that Thurber purports to have received from Defendants.[7] Defendants seek to strike these portions of the affirmation arguing that they are based on hearsay, outside of the administrative record, and irrelevant. Thurber seeks to supplement those submissions with affidavits to meet evidentiary requirements. Because this Court finds that any violations based on hearsay were harmless and subsequently corrected though Thurber's affidavit (Docket No. 53-4), and because this Court will find that the affirmation and attached exhibits do not affect the outcome of this case, Thurber's motion is granted while Defendants' motion is denied.

**D.     Standards of Review of the Plan Administrator's Decision**

Thurber's claims in this action fall under the ERISA provision that permits a participant or beneficiary of an employee benefit plan to commence a civil lawsuit "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). ERISA "permits a person denied benefits under an employee benefit plan to challenge that denial in federal court." Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 108, 128 S. Ct. 2343, 171 L. Ed. 2d 299 (2008) (citing 29 U.S.C. § 1132(a)(1)(B)). A plaintiff challenging the denial of benefits under an ERISA plan bears the burden of proving, by a preponderance of the evidence, that she is "totally disabled" within the meaning of the plan. Paese v. Hartford Life Accident Ins. Co., 449 F.3d 435, 441 (2d

---

[7]See p. 12, infra, for a description of these documents and an explanation of their relevancy.

Cir. 2006).

Courts review a plan administrator's decision to terminate benefits "under a *de novo* standard unless the benefit plan gives the administrator . . . discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Glenn, 554 U.S. at 123–24 (quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948, 956–57, 103 L. Ed. 2d 80 (1989)). If the benefit plan vests the plan administrator with discretionary authority, the denial of benefits is subject to a deferential standard of review. Glenn, 554 U.S. at 111.  Under the deferential standard, a court may not overturn the administrator's denial of benefits unless its actions are found to be arbitrary and capricious. Pagan v. Nynex Pension Plan, 52 F.3d 438, 441 (2d Cir. 1995) ("Where the written plan documents confer upon a plan administrator the discretionary authority to determine eligibility, we will not disturb the administrator's ultimate conclusion unless it is 'arbitrary and capricious.'"). "[T]he party claiming deferential review should prove the predicate that justifies it." Sharkey v. Ultramar, 70 F.3d 226, 230 (2d Cir.1995).

Thurber claims that the only Plan documents that she received from Quest in the course of her employment do not grant the Plan administrator discretion to deny her benefits. (Thurber Affidavit ¶¶ 3-6; Docket No. 53-4.)  She further claims that she was never made aware of such discretion and therefore Defendants' decision should be reviewed *de novo*. (Id. ¶ 7.) Predictably, the Plan documents submitted and authenticated by Defendants unequivocally grant themselves this discretion. Specifically, page 54 of the Administrative Record provides, *inter alia*, that "Aetna shall have discretionary authority to: determine whether and to what extent employees and beneficiaries are entitled to benefits." (AR 54.)

Thurber claims that this document is illegitimate. She argues that the "form and

format" on this document is different than the document that was provided in initial disclosures. However, these discrepancies appear to be the result of a printing and software error. (See Seybert Declaration; Docket No. 47.) Notably, she does not argue that the substance is different in any significant way. Her remaining arguments calling into question the legitimacy of the document are based on conjecture and are unsupported by legal foundation. In sum, no reasonable fact-finder could credit Thurber's unfounded claim.

Second, even assuming that this section of the Administrative Record – granting Aetna discretionary authority – was fabricated or never disclosed to Thurber, the documents in Thurber's possession sufficiently vest Aetna with the discretion to determine benefit eligibility. Specifically, these documents (Exhibits "A" and "B" of the Pierrot Affirmation) state that "a period of disability will be *certified by Aetna if, and for only as long as, Aetna determines that you are disabled*." (Pierrot Affidavit, Exhibit A, p. 3; Docket No. 40-2.) This sentence is located at the very top of the page and under the heading "Managed Disability Coverage." This is not an isolated example: the documents provided by Thurber are littered with references to the requirement that Aetna must certify the disability. Although Defendants bear the burden of proof on this issue, such language sufficiently conveys to Thurber that Aetna will have discretion to decide claims for disability. See Jordan v. Ret. Comm. of Rensselaer Polytechnic Inst., 46 F.3d 1264, 1271 (2d Cir. 1995) (magic words such as "discretion" and "deference" may not be necessary to avoid a *de novo* standard of review); Krauss v. Oxford Health Plans, Inc., 517 F.3d 614, 622 (2d Cir. 2008) ("A reservation of discretion need not actually use the words 'discretion' or 'deference' to be effective, but it must be clear. Examples of such clear language include authorization . . . to make benefits determinations 'in our judgment.'"); Fay v. Oxford Health Plan, 287 F.3d 96, 104 (2d Cir. 2002) (concluding that the benefit plan "invoke[d] discretion

by defining 'Medically Necessary' as those services which, '*as determined by [the] . . . Medical Director*,' meet four listed requirements") (emphasis and second alteration in original).   Accordingly, this Court must evaluate Defendants' decision denying Thurber's claim under the arbitrary and capricious standard of review. See  Glenn, 554 U.S. at 111; Pagan, 52 F.3d at 441.

> ### 1.         Arbitrary and Capricious Standard

The arbitrary and capricious standard of review is narrow, and constitutes the "least demanding form of judicial review of administrative action."  Seff v. NOITU Trust Fund, 781 F. Supp. 1037, 1040 (S.D.N.Y. 1992). Courts must examine whether the decision came as a result of a considered judgment of the relevant factors, and whether there is a "rational connection between the facts found and the choice made." Healix Healthcare, Inc. v. Metrahealth Ins. Co., No. 97 Civ. 6838, 1999 WL 61832, at *1 (S.D.N.Y. Feb. 10, 1999) (quoting Bowman Transp. v. Arkansas-Best Freight Sys., 419 U.S. 281, 285-86, 95 S. Ct. 438, 440-42, 42 L. Ed. 2d 447 (1974)).

The arbitrary and capricious standard is highly deferential to the plan administrator: "The court may not upset a reasonable interpretation by the administrator." Jordan, 46 F.3d at 1271 (2d Cir. 1995). This deferential review "applies to both plan interpretation and factual determinations." Dorato v. Blue Cross of W.N.Y., Inc., 163 F. Supp. 2d 203, 209 (W.D.N.Y. 2001) (citing Kinstler v. First Reliance Standard Life Ins. Co., 181 F.3d 243, 251 (2d Cir. 1999)).  As such, "it is inappropriate . . . for the trial judge to substitute his judgment for that of the plan administrator." Bella v. Metro. Life Ins. Co., No. 98-CV-150, 1999 WL 782132, at *5 (W.D.N.Y. Sept. 30, 1999).

Accordingly, the decision to deny benefits "may be overturned only if the decision

is 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'"

Kinstler, 181 F.3d at 249 (quoting Pagan, 52 F.3d at 442); Dorato, 163 F. Supp. 2d at 209.

"Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the administrator and requires more than a scintilla but less than a preponderance." Durakovic v. Bldg. Serv. 32 BJ Pension Fund, 609 F.3d 133, 141 (2d Cir. 2010) (quoting Celardo v. GNY Auto. Dealers Health & Welfare Trust, 318 F.3d 142, 146 (2d Cir. 2003)). In reviewing the administrator's decision, "district courts may consider only the evidence that the fiduciaries themselves considered." Miller v. United Welfare Fund, 72 F.3d 1066, 1071(2d Cir. 1995).

### E.   Defendants' Motion for Summary Judgment on Thurber's Claim

Defendants argue that Thurber did not meet her burden in demonstrating that she was disabled in a manner precluding her from performing her job. They argue that objective evidence in the record does not support her subjective complaints of pain or her treating physicians' determinations that she is unable to work.

Thurber believes that this conclusion was arbitrary and capricious. She makes several arguments in this regard: (1) Aetna was biased as both the Plan insurer and decision-maker under the Plan; (2) Aetna arbitrarily reversed its own decision that granted her STD benefits; (3) Aetna disregarded medical evidence such as the EMG and thermal scan reports while improperly selecting out-of-context excerpts to support their determination; and (4) Aetna never requested an Independent Medical Examination ("IME").

Despite Plaintiff's concerns, it is not this Court's task to engage in an *ad hoc* weighing of the evidence or to substitute its judgment for that of the administrator. Instead,

this Court must only determine if any genuine issue of material fact exists that could render Defendants' decision arbitrary and capricious. Unquestionably, some factual disputes exist, particularly between Thurber's treating physicians and the peer review physicians, but these disputes must create a genuine issue that the Plan administrator's determination was arbitrary and capricious. They do not.

Because the pivotal question is whether Thurber was too disabled to properly perform the functions of her job, those functions play a significant role in Aetna's and this Court's decision. Thurber was a client service representative. According to her own description, she was required to answer phones, work the switchboard, and mail and print reports. In performing these tasks, she was required to use a computer, copiers, and fax machines. According to her supervisor, she sat for 80% of the day. Despite Thurber's attempt to argue to the contrary, her job could properly be described as "sedentary." Her disability must be analyzed in that light.

In initially denying Thurber's claim, Aetna relied on office notes from Drs. Bianchi and Grant and Dr. Bianchi's CLW. Although Dr. Grant noted that she suffered from post-traumatic arthritis, he also found that she had a wide range of motion and only a small effusion. In his CLW, Dr. Bianchi remarked that she could slowly work up to an 8-hour workday and added that she might need some rest or breaks if necessary. Significantly, Dr. Bianchi noted that Thurber could both sit and stand "frequently." Relying on what is, at best, the ambivalent nature of these findings, and the lack of objective medical evidence, it was not "without reason" for Aetna to deny her claim. Although Dr. Grant took a contrary view, and is convinced that Thurber's disability prevents work, the Plan administrator is not required to "accord any special weight to the opinions of a claimant's physician; nor may

courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." <u>Black & Decker Disability Plan v. Nord</u>, 538 U.S. 822, 834, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003).

On appeal, there is no dispute that Thurber was given ample opportunity to submit documentation of her disability. In fact, Thurber was granted several extensions and two additional reviews, which were not required under the Plan. Reviewing each of these submissions, three physicians unanimously agreed that her disability did not prevent her from work. This demonstrates a "rational connection between the facts found and the choice made." <u>See</u> <u>Healix Healthcare</u>, 1999 WL 61832, at *1; <u>see also</u> <u>Hobson v. Metro. Life Ins. Co.</u>, 574 F.3d 75, 90 (2d Cir. 2009) ("[Defendant] did not abuse its discretion by considering these trained physicians' opinions solely because they were selected, and presumably compensated, by [defendant].");  <u>accord</u> <u>McDonald v. W.- S. Life Ins. Co.</u>, 347 F.3d 161, 169 (6th Cir. 2003) ("Generally, when a plan administrator chooses to rely upon the medical opinion of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits, the plan administrator's decision cannot be said to have been arbitrary and capricious because it would be possible to offer a reasoned explanation, based upon the evidence, for the plan administrator's decision.").

Of course, Thurber points to evidence in the record that suggests otherwise. But the evidence is not so compelling such that a reasonable fact-finder could call Aetna's decision arbitrary and capricious.

Massage Therapist Fahey's SOAP notes reveal only that Thurber experienced pain. Dr. Martinez found her right knee "not swollen and unremarkable" and her left knee "not swollen." Dr. Bianchi submitted a one-sentence letter stating that he felt Thurber could not

17

work, but provided no foundation for this claim, which appears to contradict, at least in part, his earlier findings. Thurber claims that this letter "clarified" his earlier findings. If anything, such a hasty, unsubstantiated conclusion only serves to confuse them.

Thurber also emphasizes Dr. Blumberg's mistaken attribution of Dr. Bianchi's CLW to Dr. Grant. Yet, regardless of whether Dr. Blumberg actually believed that Dr. Grant prepared the CLW or if it was simply an oversight, the substance of the CLW, no matter who prepared it, remains the same – Thurber could frequently sit and stand, which is all her job required.

Perhaps Thurber's most persuasive evidence comes from the FCE performed on October 30, 2008. Occupational Therapist Orrange conducted a series of tests and found that Thurber did not "demonstrate the ability to perform at a sedentary physical demand level work of work [sic]." However, Orrange also found only "moderate limitations" in the pertinent areas of walking, balance, and static sitting. The only "activities to be avoided" were lifting, carrying, crawling, low level postures, and step-ladder climbing. Orrange checked boxes that indicated Thurber should only sit for 6%-33% of an 8-hour workday, but instead of recommending that she should limit this activity, as she did for static standing, or state that sitting is "not safe," as she did with step-ladder climbing, she merely suggested that Thurber frequently change her position when sitting.

Again, given this conflicting report – in which Orrange concludes that Thurber cannot work, but finds only moderate limitations in the activities associated with her job – it was not unreasonable for Aetna to disagree with Orrange's ultimate conclusion, especially in light of the contrary opinion from Dr. Rangaswamy, who reviewed the FCE. See Lekperic v. Bldg. Serv. 32B-J Health Fund, No. 02 CV 5726, 2004 WL 1638170, at *4 (E.D.N.Y. July

18

23, 2004) ("The mere existence of conflicting evidence does not render the . . . decision arbitrary or capricious.").

Thurber also questions Aetna's decision declining to order an IME. Yet, with little objective evidence in the record supporting Thurber's claim, this Court finds that this decision does not create a triable issue of fact. See Hobson, 574 F.3d at 91 ("However, as the four circuits that have addressed the question have concluded, where the ERISA plan administrator retains the discretion to interpret the terms of its plan, the administrator may elect not to conduct an IME, particularly where the claimant's medical evidence on its face fails to establish that she is disabled.").[8,9,10]

Finally, this Court finds that whatever conflict of interest under which Aetna operates as both Plan administrator and Plan insurer, does not tip the scales in Thurber's favor. In Glenn, the Supreme Court instructed that such a conflict should "be weighed as a factor in determining whether there is an abuse of discretion." 554 U.S. at 116 (quoting Firestone, 489 U.S. at 115) (internal quotation marks omitted.) The Court further noted that an insurer may be able to reduce or eliminate a conflict by taking steps like Aetna took here. See

---

[8]Thurber also claims that Aetna's decision was arbitrary and capricious because it did not consider her spinal irregularities. First, there is little support in the record demonstrating that her spinal problems prevented her from performing her job. Second, she did not raise this concern until eight months after her claim for LTD benefits was originally denied. In fact, this concern is not found in her original STD claim, her original LTD claim, or her Complaint. Finally, Dr. Bianchi, her chiropractor, did not mention any spinal problems. Accordingly, this is not a genuine issue of material fact.

[9]This Court has also considered what Thurber calls Aetna's conflicting decision to grant her STD benefits but deny her LTD benefits. But based on the totality of the evidence in the record, summarized above, its determination, although different from its initial judgment (made directly after Thurber was in a car accident), was not arbitrary and capricious. See Fitzpatrick v. Bayer Corp., No. 04 Civ. 5134, 2008 WL 169318, at *9 (S.D.N.Y. Jan. 17, 2008) ("There is nothing in the caselaw suggesting that the burden of proof shifts to the Defendants if the Plaintiff previously received benefits").

[10]Nor does the record indicate that Thurber was not given a full and fair review, as Thurber asserts. To the contrary, she was granted two additional reviews and was permitted to submit a series documents and extend several deadlines. This claim is without merit.

<u>Glenn</u>, 554 U.S. at 117-18. Namely, by "walling-off" its claims department from its financial department, which Aetna did. <u>See id.</u>; (Laughran Declaration ¶ 15.) Aetna also maintains a separate appeals unit distinct from both the claims unit and the underwriters department. (Laughran Declaration ¶ 15.) Lastly, the Court instructed that such a conflict will "act as a tiebreaker when the other factors are closely balanced." <u>Glenn</u>, 554 U.S. at 117. Because this Court finds that other factors are not closely balanced, there is no tie to break, and thus the conflict-of-interest factor plays an insignificant role.

Under the extremely deferential standard that this Court must apply, there is no reason to disturb Defendants' decision. Defendants' medical reviewers considered the submitted medical evidence and provided Thurber ample opportunity to submit additional evidence in support of her claim. The Plan vests Defendants with the discretion to determine, based on the evidence submitted, whether a claimant is entitled to benefits. Defendants exercised that discretion in this case, and there is a valid and rational basis in the administrative record for their conclusion that Thurber's ailments did not prevent her from performing the essential functions of her sedentary occupation. As such, this Court finds that there is no genuine issue of material fact that could render Defendants' decision arbitrary and capricious.

**F.      Defendants' Motion for Summary Judgment on their Counterclaim**[11]

The Plan provides that any STD benefits may be offset by "other income," including

---

[11]No deferential standard of review applies to Defendants' counterclaim. <u>See</u> <u>Kellner v. First Unum Life Ins. Co.</u>, 589 F. Supp. 2d 291, 313 (S.D.N.Y. 2008) ("Although Defendant's benefits determinations must be reviewed deferentially, [Defendant] is entitled to no such deference with respect to its counterclaim.").

no-fault wage replacement benefits. (AR 198.) In completing a questionnaire entitled "Other Income," signed February 8, 2008, Thurber indicated that she received $1,202.32 monthly, starting August 16, 2007, from no-fault automobile insurance coverage. Because Thurber never remitted these funds to Defendants, they bring a counterclaim under Section 502(a)(3)(B) of ERISA asserting that Thurber owes them a total of $7,213.92 ($1202.32 per month from August 2007 to February 2008, when her STD benefits expired) in equitable restitution from the no-fault benefits.

Thurber argues that this Court does not have subject matter jurisdiction over Defendants' counterclaim under Section 502(a)(3)(B) of ERISA, which authorizes a civil action by a "participant, beneficiary, or fiduciary . . . to obtain other appropriate equitable relief." 29 U.S.C. § 1132(a)(3). Thurber argues that the counterclaim is not equitable, but legal, rendering it improper under this section.

In support of this contention, Thurber relies on Fehn v. Group Long-Term Disability Plan for Emps. of J.P. Morgan Chase Bank, No. 07 Civ. 8321 (WCC), 2008 WL 2754069, (S.D.N.Y. June 30, 2008). There, citing two relevant Supreme Court decisions,  the court found that the defendant/ERISA plan-insurer could not recover funds improperly paid to the plaintiff because the money was not limited to a segregated fund. Id. at *4. Like Thurber in this case, whatever money the defendant had mistakenly paid to the plaintiff was "dissipated" and thus the court found that the claim sought to impose personal liability, not equitable relief. Id. at *3 ("[W]here the property or its proceeds 'have been dissipated so that no product remains,' the plaintiff's claim is that of a general creditor" (quoting Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 213, 122 S. Ct. 708, 151 L. Ed. 2d 535 (2002).)).

21

Defendants distinguish this case by noting that Thurber was on notice that other income benefits would be subject to recoupment and points out that they were not aware of the overpayment until Thurber applied for LTD benefits. In support of this contention, they rely on Cusson v. Liberty Assurance Co. of Boston, 592 F.3d 215, 231 (1st Cir. 2010), which addressed the question of overpayment relating to Social Security benefits. There, the court found that although the defendant/ERISA plan-insurer had "not identified a specific account in which the funds are kept," the claim to recoup overpayment of benefits was still equitable because the plan put the plaintiff/beneficiary "on notice that she would be required to reimburse" the plan insurer for any overpayment. Id. at 231.

Yet, in determining whether such relief is equitable or legal, these arguments miss a more fundamental tenant. Restitution in equity is only available where the money in question can be identified as "belonging in good conscience to the plaintiff." Knudson, 534 U.S. at 213. Here, contrarily, the money does not "belong" to Aetna. Instead, the Plan simply states, "[y]our STD and LTD benefits may be reduced if you receive Other Income Benefits while you are disabled." (AR 198). Thus, the plain language of the Plan, which Aetna claims gives it an equitable right to funds already disbursed, in fact only states that benefits "may be reduced." "May" implies a discretionary act, not a conclusive right to the funds. "Reduced" implies that the funds will be limited before disbursement, not that funds must later be returned. Although not relied on by Aetna, three pages later, under the heading "Recovery of Overpayments," the Plan authorizes Aetna to require repayment: "If payments are made in an amount greater than the benefits you are entitled to receive, the [P]lan may require you to return the overpayment within thirty (30) days." (AR 201; emphasis added.) Notwithstanding the temporal limitation, the Plan does not explicitly bind

the Plan participant to reimburse overpaid funds, but simply grants Aetna the ability to seek the funds. Conversely, in all the plans in the cases relied on by Defendants, each explicitly granted the plan insurers a right to the funds themselves. See Sereboff v. Mid Atl. Med. Servs., Inc., 547 U.S. 356, 126 S. Ct. 1869, 164 L. Ed. 2d 612 (2006) ("[The plan] *requires* a beneficiary who 'receives benefits' under the plan for such injuries to 'reimburse [defendant/plan insurer]' for those benefits from '[a]ll recoveries from a third party.'" (Emphasis added; second alteration in original)); Cusson, 592 F.3d at 231 (finding that the plan made clear that the plan participant "would be *required* to reimburse [plan insurer] for an amount equal to what she might get from Social Security"); Fedderwitz v. Metro. Life Ins. Co. Inc.'s Disability Unit, No. 05 CV 10193(BSJ)(HP), 2007 WL 2846365, at *11 (S.D.N.Y. Sept. 27, 2007) ("[Plan participant] does not contest the fact that he signed an Agreement to Reimburse Overpayment of Long Term Disability Benefits."). Defendants may have a contractual and legal right to exercise their option to seek recovery of the allegedly overpaid funds; but because the Plan only reserves them the right to act, not a right to the funds themselves, they do not have an equitable claim. Accordingly, § 502(a)(3) does not authorize this counterclaim and Defendants' motion for summary judgment is denied.

Although Defendants' couch their counterclaim under § 502(a)(3), to the extent that they seek relief under state contract law, having disposed of all federal claims and because jurisdiction was founded on 29 U.S.C. 1132(e), this Court declines to exercise supplemental jurisdiction under 28 U.S.C. 1367(c).

## IV. CONCLUSION

For the foregoing reasons, this Court finds that no genuine issue of material fact exists as to whether Defendants acted arbitrarily and capriciously in denying Plaintiff LTD benefits. Additionally, Defendants' counterclaim seeks legal, not equitable relief and thus this Court lacks subject matter jurisdiction under 29 U.S.C. § 1132(a)(3). Accordingly, Defendants' Motion for Summary Judgment is granted with respect to Plaintiff's claims and denied with respect to its Counterclaim.

## V.  ORDERS

IT HEREBY IS ORDERED, that Plaintiff's Motion for Leave to Supplement Plaintiff's Opposition (Docket No. 53) is GRANTED.

FURTHER, that Plaintiff's Motion to Strike (Docket No. 37) is DENIED.

FURTHER, that Defendants' Motion to Strike (Docket No. 50) is DENIED.

FURTHER, that Defendants' Motion for Summary Judgment (Docket No. 28) is GRANTED in part and DENIED in part.

FURTHER, that the Clerk of the Court is directed to close this case.

SO ORDERED.

Dated:   December 30, 2011
           Buffalo, New York

/s/William M. Skretny

WILLIAM M. SKRETNY
Chief Judge
United States District Court